Rehearing en banc granted by order filed 3/24/03;
corrected opinion filed 2/14/03 is vacated.

**CORRECTED OPINION**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TIMOTHY LANIER ALLEN,
    *Petitioner-Appellant,*

    v.                              No. 02-5

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-97-959-5-H-HC)

Argued: September 25, 2002

Decided: February 5, 2003

Corrected Opinion Filed: February 14, 2003

Before NIEMEYER, MOTZ, and GREGORY, Circuit Judges.

---

Affirmed in part, reversed in part, vacated, and remanded by published opinion. Judge Gregory wrote the majority opinion, in which Judge Motz joined. Judge Niemeyer wrote a dissenting opinion.

---

Opinion corrected to include
correct version of dissenting opinion

---

**COUNSEL**

**ARGUED:** John Richard Rittelmeyer, HARTZELL & WHITEMAN, L.L.P., Raleigh, North Carolina, for Appellant. Jonathan Porter Babb, Sr., Special Deputy Attorney General, Steven Franklin Bryant, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Gretchen M. Engel, CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

After a jury convicted Timothy Lanier Allen of first-degree murder, a North Carolina state court sentenced him to death. Allen unsuccessfully challenged his conviction and sentence in the North Carolina courts and in the Supreme Court of the United States. Thereafter, Allen filed for habeas relief in federal district court. The district court granted summary judgment for the State, and granted a certificate of appealability on six claims. Allen now appeals the denial of his petition for habeas relief. For the reasons that follow, we dismiss one claim, affirm the district court on one claim, and reverse the district court on two claims.

I.

Timothy Lanier Allen, an African American, was tried and convicted of first-degree murder for killing Raymond E. Worley, a white North Carolina State Highway Patrol officer. At trial, the State used eleven of thirteen peremptory challenges against otherwise qualified African American members of the venire. Seven African Americans were seated on the jury, one of whom was later removed for cause during the trial. Allen's fate was finally decided by a jury of six blacks and six whites.

2

At sentencing, the jury was instructed, in part, that they should "unanimously" find from the evidence whether one or more mitigating circumstances were present. The jury unanimously found the existence of three mitigating circumstances, but concluded that these mitigating circumstances were insufficient to outweigh the aggravating circumstances, and therefore recommended the death penalty. After reading the verdict, the court polled each juror. The court re-read the jury instructions requiring unanimity, and then asked each juror if the jury's answers were "still your answers" and if each juror "still assent[ed] thereto." The jurors affirmed their recommendation of the death sentence, which the court imposed.

Allen appealed his conviction to the Supreme Court of North Carolina, which found no error in either the guilt or sentencing phases of Allen's trial. He then appealed that decision to the Supreme Court of the United States, which vacated Allen's death sentence and remanded the case for consideration in light of *McKoy v. North Carolina*, 494 U.S. 433 (1990) (holding that North Carolina's capital murder jury instruction requiring unanimity in finding mitigating circumstances was unconstitutional). On remand, the North Carolina Supreme Court found that the *McKoy* error was harmless beyond a reasonable doubt and reinstated the sentence. Allen again appealed to the Supreme Court of the United States, which denied certiorari.

Allen then filed a habeas petition and a motion under Fed. R. Civ. P. 59(e) in federal district court. The district court granted summary judgment for the government on Allen's petition for writ of habeas corpus, denied the Rule 59(e) motion, and granted a certificate of appealability on six claims. Allen now appeals three of the claims for which a certificate was granted and one claim for which a certificate was denied.

## II.

We review the district court's decision to grant or deny habeas relief *de novo*. *Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). On the claim for which the district court has not already granted a certificate of appealability, we must first determine whether "the applicant has made a substantial showing of the denial of a constitutional right."

3

28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make this showing, Allen must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were `"adequate to deserve encouragement to proceed further."'" *Id.* at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4 (1983)). Once a certificate of appealability has issued, we may only grant habeas corpus relief if we find that the state court's decision "was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Frye v. Lee*, 235 F.3d 897, 903 (4th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000)).

## III.

Allen asserts four arguments before this Court: (1) the short-form indictment was unconstitutional; (2) the prosecution unlawfully concealed his jail records, which indicated that he received daily doses of anti-withdrawal medication; (3) the prosecution used its peremptory challenges in a racially discriminatory manner; and (4) the poll of the jury did not cure the harmful effect of the unconstitutional jury instruction. We review each argument in turn.

### A.

Allen asserts that the short-form indictment failed to allege each element of the crime of first-degree murder and any aggravating circumstance supporting the death sentence. He contends that these defects render his first-degree murder conviction and death sentence invalid under *Jones v. United States*, 526 U.S. 227 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district court denied Allen a certificate of appealability on this issue. Thus, before considering his claim on the merits, we must first determine whether "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).

A short-form indictment alleging elements of common law murder is sufficient to inform the defendant of the charge against him, and thus satisfies the requirements of the Sixth Amendment and the Due

4

Process Clause. *See, e.g.*, *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002) (where this Court, in a well-reasoned opinion, considered a challenge to a short-form indictment that is materially indistinguishable from the indictment in Allen's case). Because the short-form indictment does not raise a substantial constitutional question upon which reasonable jurists could disagree, we deny a certificate of appealability and dismiss this claim.

B.

Next, Allen asserts that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by concealing jail records indicating he was given substantial daily doses of anti-withdrawal medication during the week following the crime.[1] Because the district court has issued a certificate of appealability, we proceed directly to the merits of Allen's claim.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[M]ateriality under *Brady* means that `there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Fullwood v. Lee*, 290 F.3d 663, 687 (4th Cir. 2002) (citations omitted).

In Allen's case, the jail records are not material to a *Brady* chal-

---

[1] Allen also argues that the state violated his rights under *Napue v. Illinois*, 360 U.S. 264 (1959), when the prosecutor failed to correct the testimony of Dr. William Brown, who testified that Allen was never given any anti-withdrawal medication. The North Carolina court found this claim procedurally barred because it was not raised in Allen's first Motion for Appropriate Relief. We find this claim procedurally defaulted because Allen failed to make a showing of cause and prejudice or actual innocence to establish a fundamental miscarriage of justice. *See Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992). Even if this claim was not procedurally defaulted, this assertion is meritless because Dr. Brown testified that *he* had not given Allen any medication, not that Allen never received any medication.

5

lenge because Allen testified at trial that he was neither under the influence of illegal drugs nor experiencing withdrawal at the time of the murder. Even if Allen received the anti-withdrawal medication, therefore, his testimony nullifies what, if any, probative value the jail records would have as to guilt or punishment. Thus, the *Brady* claim is without merit, and we affirm the district court.

C.

We next address Allen's claim that his Sixth and Fourteenth Amendment rights were violated under *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court granted Allen a certificate of appealability on this issue. Thus, Allen has already made "a substantial showing of the denial of a constitutional right." *Slack*, 529 U.S. at 484. Accordingly, we proceed to the substance of Allen's claim.

Allen contends that the prosecution violated his constitutional rights by using eleven of thirteen (84.6%) peremptory challenges against otherwise qualified African American members of the venire, while the venire consisted of only 24 (36.3%) African Americans. Allen filed a pretrial motion on July 19, 1985, requesting additional peremptory challenges for the defense because the prosecutor had a "propensity toward excluding blacks from trial juries by use of his peremptory challenges." (S.J.A. at 2.) The trial court denied this motion and proceeded with trial. Upon Allen's conviction and sentencing, Allen brought a direct appeal to the North Carolina Supreme Court, which the court dismissed. For the reasons articulated below, we find that the North Carolina Supreme Court's *Batson* analysis is contrary to clearly established Federal law, as determined by the Supreme Court.

1.

Before considering Allen's *Batson* claim on the merits, however, we must first determine whether defense counsel has adequately preserved a *Batson* objection. Allen's trial took place pre-*Batson*, when the governing law on racial discrimination in jury selection was *Swain v. Alabama*, 380 U.S. 202 (1965).[2] Under *Swain*, a defendant was

---

[2] Although *Batson* had not been decided at the time that Allen went to trial, *Batson* can be applied retroactively to cases on direct appeal. *See Teague v. Lane*, 489 U.S. 288, 295 (1989).

6

required to "show the prosecutor's systematic use of peremptory challenges" to strike African American jurors "over a period of time." *Id.* at 227. Allen's attorneys attempted to meet this burden by filing a pretrial motion focusing on the State's history of excluding black jurors. Because *Swain* asked a trial court to consider the government's use of strikes "over time" rather than in the specific case before the court, Allen's motion was denied before the prosecution had used a single peremptory challenge, and Allen never raised the objection again. Thus, the issue before this Court is whether a pretrial motion alleging that the prosecution has shown a propensity toward excluding African American jurors is sufficient to preserve a *Batson* claim on appeal.

The Supreme Court considered this question in *Ford v. Georgia*, 498 U.S. 411 (1991). In *Ford*, an African American defendant, James A. Ford, filed a pretrial "`Motion to Restrict Racial Use of Peremptory Challenges,' alleging that the prosecutor . . . had `over a long period of time' excluded black persons from juries. . . ." *Id.* at 413-14. Although the defendant failed to cite to any legal authority, the Supreme Court interpreted his motion as effectively raising an objection under *Swain*. *Id.* at 418. The Court explained, "We think petitioner must be treated as having raised such a claim, although he certainly failed to do it with the clarity that appropriate citations would have promoted." *Id.* Following the trial court's denial of this motion, "the prosecution exercised 9 of its 10 peremptory challenges to strike black prospective jurors, leaving 1 black venire member on the jury." *Id.* Ford did not object to the use of peremptories as to any of these individual jurors. Rather, he waited and raised the *Swain* issue for a second time in a post-conviction motion for a new trial. *Id.* at 416.

The Supreme Court ruled that Ford's initial, pretrial motion was sufficient to preserve the *Batson* issue on appeal. Writing for a unanimous Court, Justice Souter stated:

> Both *Swain* and *Batson* recognized that a purposeful exclusion of members of the defendant's race from the jury selected to try him would work a denial of equal protection. . . . Because *Batson* did not change the nature of the violation recognized in *Swain*, but merely the quantum of proof

7

necessary to substantiate a particular claim, it follows that
a defendant alleging a violation of equal protection of the
law under *Swain* necessarily states an equal protection viola-
tion subject to proof under the *Batson* standard of circum-
stantial evidence as well.

*Id.* at 420.

Following *Ford*, several of our sister circuits have elaborated on
when a defendant should be deemed to have waived a *Batson* claim.
In *Wilkerson v. Collins*, 950 F.2d 1054, 1062-63 (1992), the Fifth Cir-
cuit considered a *Batson* claim by a defendant who failed to object to
the prosecution's use of peremptory challenges before trial, during
jury selection, or at any other time during the trial. The State argued
that "notwithstanding the retroactivity of *Batson*, [the defendant] for-
feited review as a matter of law by his failure to lodge a contempora-
neous objection . . . ." *Id.* at 1063. The Fifth Circuit agreed, reasoning,
"A contemporaneous objection would have provoked court consider-
ation of this alleged misconduct at a point *before trial* where it could
have been readily corrected." *Id.* (emphasis added). In *Lockett v.
Anderson*, the Fifth Circuit reaffirmed this rule, explaining that "we
find no evidence that any inquiry was made as to the prosecutor's
rationale for excluding all black members of the jury pool. . . . Thus,
we have no facts or arguments before us upon which to base a *Batson*
inquiry." 230 F.3d 695, 706 (2000). Similarly, the Second Circuit has
focused on the fact that "the nature of the peremptory challenge man-
dates that any objection to its use be raised and ruled upon promptly."
*McCrory v. Henderson*, 82 F.3d 1243, 1247 (1996). Thus, the court
held, "the failure to object to the discriminatory use of peremptory
challenges prior to the conclusion of jury selection waives the objec-
tion." *Id*. at 1249. Because the defendant "did not raise any challenge
until three and one half months after the conclusion of jury selection,
he forfeited his *Batson* claim." *Id.*

In each of these cases wherein the *Batson* claim was waived, the
court relied on a defendant's failure to make *any* challenge — either
under *Batson* or *Swain*. The focus in each case was on whether the
trial court had been afforded at least some minimal opportunity to
address the constitutional objection, regardless of the form of that
objection.

8

Consistent with this reasoning, the Eleventh Circuit has specifically held that "In cases . . . where the trial took place pre-*Batson*, a properly made *Swain* claim made in a pretrial motion is treated as a timely made *Batson* objection for the purpose of preserving the *Batson* issue for appeal." *Cochran v. Herring*, 43 F.3d 1404, 1409 n.7 (11th Cir. 1995). In *Cochran*, just as in the present case, the defendant, "before the actual striking of jurors began," filed a *Swain* motion based on the prosecution's history of systematically striking African American jurors. *Id.* at 1406. The trial court denied the motion, and defense counsel never raised the issue again, even though the prosecution eventually struck "seven of the nine black members of the venire panel." *Id.* Despite Cochran's failure to object to the use of peremptory challenges as to any specific juror, the Eleventh Circuit held that the pretrial *Swain* motion on its own was sufficient to preserve the *Batson* issue. *Id.* at 1409-10. *See also Wright v. Hopper*, 169 F.3d 695, 708-09 (11th Cir. 1999).

Allen, like the defendants in *Ford* and *Cochran*, presented the trial court with a pretrial motion arguing that "the Prosecutor has shown a propensity toward excluding blacks from trial juries by use of his premptory [sic] challenges in cases wherein the Defendant is a black person, and the Defendant expects that the Prosecutor will follow that practice in this case." (S.J.A. at 2.) With this language, Allen effectively raised an objection under *Swain*. *See Ford*, 498 U.S. at 418.

In suggesting a remedy, Allen requested that the trial court grant him additional peremptory challenges in order to blunt the government's efforts at discrimination. (S.J.A. at 1.) The better remedy might have been to directly prohibit the prosecution from using its peremptories in a racially discriminatory manner. However, regardless of the remedy sought, the fact remains that Allen properly raised the *Swain* issue to the trial court. As the Second Circuit explained:

> If the objection is raised during jury selection, the error is remediable in any one of a number of ways. Challenges found to be abusive might be disallowed; if this is not feasible . . . additional jurors might be called to the venire and *additional challenges granted to the defendant* ; or in cases where those remedies are insufficient, the jury selection might begin anew with a fresh panel. If, on the other hand,

9

> a *Batson* objection may be raised after the jury has been
> sworn and trial has begun, there can be no remedy short of
> aborting the trial.

*McCrory*, 82 F.3d at 1247 (emphasis added) (internal citations omitted). In short, the focus is not on whether a defendant requested a particular kind of relief, but rather, whether he provided the trial court with an opportunity to correct the constitutional violation before the jury was empaneled. In this case, Allen's pretrial motion achieved this result, and therefore it is sufficient to preserve Allen's *Batson* claim.[3]

In sum, consistent with the Supreme Court and each circuit to have considered the question, we find that Allen's *Swain* motion is a sufficient contemporaneous objection to preserve the *Batson* issue for this habeas petition. Thus, we now turn to the substance of Allen's *Batson* claim.

2.

In conducting a *Batson* hearing, a court must first determine whether a defendant can show that: (1) the defendant is a member of a cognizable racial group; (2) the prosecutor used the challenges to remove members of the defendant's race from the venire; and (3)

---

[3] We note that the Third Circuit has recently considered a case in which, unlike the case at hand, no adequate contemporaneous objection preserved the *Batson* challenge. *See Riley v. Taylor*, 277 F.3d 261, 274 (3rd Cir. 2001) (*en banc*). However, the court reasoned that since "the last state court to be presented with a particular federal claim reache[d] the merits, it remove[d] any bar to federal-court review that might otherwise have been available." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Riley v. Taylor*, 277 F.3d at 274. In *Riley*, the court considered the claim of a defendant who failed to raise either a *Swain* or a *Batson* objection at trial. *Id.* The Delaware Supreme Court, however, reviewed Riley's *Batson* claim on the merits, both on direct appeal and as presented in post-conviction motions. *Id.* The Third Circuit held that, although the defendant failed to raise the claim to the trial court, "Riley's *Batson* claim [was] not procedurally barred . . . ." *Id.* at 275. In Allen's case, the North Carolina Supreme Court similarly considered and rejected Allen's *Batson* claim on the merits. *See State v. Allen*, 372 S.E.2d 855, 861-62 (N.C. 1988).

10

other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her use of peremptory challenges. *Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998), *cert. denied*, 527 U.S. 1011 (1999); *Batson*, 476 U.S. at 96-97. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97.

Without considering any of Allen's evidence of discrimination, the North Carolina Supreme Court denied Allen's *Batson* claim. In its ruling, the court relied wholly on the fact that the majority of the seated jurors were African American, and dismissed the claim. *See State v. Allen*, 372 S.E.2d 855, 862 (N.C. 1988). Reviewing the facts as presented in the record, we find that this denial "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court." *Frye v. Lee*, 235 F.3d at 903. *See Keel*, 162 F.3d at 271 (outlining the elements of a *Batson* claim). The Equal Protection Clause forbids a prosecutor from challenging any single potential juror solely on account of that individual's race. *Batson*, 476 U.S. at 89. If the prosecution strikes one African American juror for discriminatory reasons, that alone is sufficient to support a *Batson* challenge, even if other African Americans remain on the jury. By focusing *solely* on the racial make-up of the jury that finally heard Allen's case, the North Carolina Supreme Court never analyzed Allen's evidence of discrimination, in plain contravention of clearly established federal law. Although it was appropriate to take into consideration evidence of who was seated, the court should have focused on those members of the venire who were *excluded* from the jury for allegedly unconstitutional reasons as *Batson* requires.

As contained in the record, Allen's evidence of discrimination is compelling. Out of 66 prospective jurors on the venire, 38 (57.5%) were white, 24 (36.3%) were African American, and 4 (6%) were of another race. (J.A. at 57.) The prosecution used 84.6% of its peremptory challenges to exclude African Americans from the jury, even though African Americans only represented 36.3% of the venire presented.

In addition to this statistical evidence, circumstantial evidence in the record also supports a finding that the prosecution struck some

11

jurors on the basis of race. For example, as jury selection began, the prosecution learned that Juror Thorne, a white woman in Seat 9, had known defense counsel "through the years as he was growing up," and also knew his parents well. (Tr. of Proceedings, *Allen v. French*, 5:97-HC-959-H, at 103 (N.C. Super. Ct. Nov. 8-13, 1985)). In addition, Thorne had read newspaper accounts of the shooting and pre-trial activity. (Tr. at 99.) Thorne also had a daughter and two grand-children, (Tr. at 129), and thus might have been especially sympathetic to the testimony of Allen's mother. Despite the possibility that Thorne would be influenced by her experiences as a mother and grandmother, her exposure to media accounts of the shooting, as well as the likelihood that she would trust a defense lawyer whom she had known well since his childhood, the government left her on the jury.

The decision to keep Juror Thorne is particularly suspect when compared to the prosecutor's decision to strike Juror Davis, an African American woman in Seat 1. On the record, Davis stated that she knew of one of the defense attorneys, Mr. Graham, but that she and Graham were not friends or acquaintances, and that Graham had never done any legal work for her or any member of her family. (Tr. at 348-49). When asked to clarify what she did know about Graham, Davis stated, "Nothing other than knowing he works up here and see-ing him at the store." (Tr. at 348.) Considering that the prosecutor had no problem with Thorne despite her long-term relationship with defense counsel, it is unlikely that the prosecutor was concerned about Davis' tenuous and casual connection with that same lawyer.

The only other questions put to Davis related to whether she could impose the death penalty. Each of these she answered directly and without hesitation. (*See* Tr. at 361-62.) To the question, "Do you think that there are certain circumstances where the death penalty would be the appropriate punishment?", Davis answered, "Yes." When asked, "If the evidence in this case and the law as explained by her Honor indicated that the appropriate punishment was the death penalty, would you be able to recommend that to the Court, knowing that her Honor would be bound to follow your recommendation? ", she again stated, "Yes." Finally, when asked if she would be "emotionally capa-ble" of recommending the death penalty, Davis answered, "Yes." (Tr. at 361-62.) Davis was never questioned again. Unlike many other

12

jurors, she was never asked about her marital status, whether she had any children,[4] or where she might be employed.[5]

Despite this evidence that race was a factor in the prosecution's use of peremptory challenges, the government insists that no *Batson* violation exists because the jury was 58% African American.[6] (Br. of Appellee, at 23). In addition, the government emphasizes that, in leaving seven African American on the jury, "the State did not use all of its peremptory challenges." (Br. of Appellee, at 22). At most, however, this evidence only shows that race may not have been a determinative factor *every* time an African American juror was called to the jury box. It is undeniable that a racially biased use of a peremptory challenge against even a single potential juror violates *Batson*. Therefore, a court is not relieved of its duty to consider all of the relevant evidence simply because some African Americans were seated on the jury.

Allen is entitled to habeas relief because the North Carolina Supreme Court flatly refused to consider all of the facts and circumstances of discrimination that Allen proffered; instead, it summarily concluded that "the defendant has not made a prima facie showing of

---

[4] In its brief, the government submits that Juror Davis "had a son." (Br. of Appellee, at 27.) Any personal information about Ms. Davis, however, is absent from the transcript. From the time she is called to the jury box (Tr. at 345) to the time she is stricken (Tr. at 442), the only information we learn about Davis is that she knew of one of the defense attorneys and that she had no qualms about imposing the death penalty.

[5] In addition to Juror Davis, there are other members of the venire who were peremptorily challenged in a manner that is difficult to explain without reference to race. For example, the State struck Juror Macon, an African American woman whose husband worked in law enforcement as a prison guard. (Tr. at 125). Although she and her husband were legally separated at the time of the trial (Tr. at 125), Macon would still be familiar with and sympathetic to the risks that law enforcement officers faced every day. As such, she might have been an ideal pro-government juror, since the case involved the murder of a state trooper in the performance of his law-enforcement duties.

[6] The jury that was initially empaneled was 58% African American. Because one juror was excused for cause mid-trial, the jury that decided Allen's case was 50% African American.

13

racially motivated peremptory challenges when the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black." *State v. Allen*, 372 S.E.2d at 862. The court's reasoning, in its entirety, was as follows:

> In this case the jury before which the defendant was tried consisted of seven black persons and five white persons. Of the seventeen black veniremen tendered to the State (including alternates), it accepted seven or forty-one percent. In *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365 (N.C. 1987), we held that the defendant did not make a prima facie case of racially motivated peremptory challenges when the State peremptorily challenged three of five black veniremen tendered to it. In *State v. Belton*, 318 N.C. 141, 347 S.E.2d 755 (N.C. 1986), we held an inference that racially motivated peremptory challenges did not arise when the State peremptorily challenged six of the twelve black jurors tendered. In that case the State peremptorily challenged five white jurors. We hold pursuant to *Abbott* and *Belton* that the defendant has not made a prima facie showing of racially motivated peremptory challenges when the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black.

*Allen*, 372 S.E.2d at 862. In relying on the ratio of black jurors seated to black jurors tendered, the North Carolina Supreme Court has turned the *Batson* analysis on its head. Indeed, the *Batson* Court held that "`[a] single invidiously discriminatory governmental act' is not `immunized by the absence of such discrimination in the making of other comparable decisions.'" *Batson*, 476 U.S. at 95 (quoting *Arlington Heights v. Metro Hous. Dep't Corp.*, 429 U.S. 252, 266 n. 14 (1977)).

The Court further outlined the precedential underpinnings of this rule, which stretch back to the nineteenth century case of *Strauder v. West Virginia*, 100 U.S. 303 (1880). The *Batson* Court explained, "In holding that racial discrimination in jury selection offends the Equal Protection Clause, the Court in *Strauder* recognized . . . that a defendant has no right to a `petit jury composed in whole or in part of persons of his own race.' *Id.* at 305. . . . But the defendant does have the

14

right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." 476 U.S. at 85. The Court observed that discrimination in jury selection reached beyond the defendant on trial, and noted that "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror" as well. *Id.* at 87 (citing *Strauder*, 100 U.S. at 308). For these reasons, the Court concluded that "the rule of law will be strengthened if we ensure that *no citizen* is disqualified from jury service because of his race." *Id.* at 99 (emphasis added).

In fact, courts interpreting *Batson* around the time of the North Carolina Supreme Court's decision in the instant case (1988) emphasized *Batson*'s focus on the excluded juror. *See*, *e.g.*, *United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991) ("The district court erred in ruling that a *Batson* violation did not occur since members of the defendants' racial group were seated on the jury."); *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989) ("As Lane correctly points out, striking only one black prospective juror for a discriminatory reason violates a black defendant's equal protection rights, even when other black jurors are seated and even when valid reasons are articulated for challenges to other black prospective jurors."); *Chisolm v. State*, 529 So.2d 635, 637 (Miss. 1988) ("Among the few clues *Batson* gives [regarding] how we are to enforce the new claim it announces, we are directed to concentrate on the juror excluded, not those accepted . . . ."); *Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir. 1986) (quoting *Arlington* passage from *Batson* and stating that "nothing in *Batson* compels the district court's conclusion that constitutional guarantees are never abridged if all black voters but one or two are struck because of their race").

Under the North Carolina rule, however, the State could discriminate against some African American jurors (three out of five, for example), as long as others made it through the jury selection process unchallenged. Hypothetically, given this reasoning, Allen's *Batson* challenge would have failed even if the State had used all of its strikes against African Americans because seven African Americans were seated on the jury.

An additional problem with the North Carolina test is that evidence of who is seated on a jury is less compelling than evidence of who

is struck. A prosecutor only has a limited ability to control who is eventually seated on the jury. The defendant's use of strikes, the court's ruling on motions for cause, and the role of chance in who is pulled from the venire, all greatly affect the final composition of the jury. In light of these factors, a prosecutor seeking to exclude jurors on the basis of race can only do so much. As a result, the best and most direct evidence in a *Batson* challenge is evidence of whom the government chose to strike, because that is something over which the prosecutor has complete and undiluted control.

In sum, the North Carolina test brazenly contradicts clearly established Supreme Court precedent. Accordingly, we remand the case to the district court so that it may, in its discretion, itself hold a hearing on petitioner's *Batson* claim (and if warranted by that hearing, order a new trial) or return the case to the state trial court on a conditional writ of habeas corpus so that the state court can conduct its own inquiry. *See Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d Cir. 1998); *see also Howell v. Barker*, 904 F.2d 889, 896 (4th Cir. 1990) (granting writ conditioned on failure of state to retry defendant by date set by district court). In conducting its *Batson* analysis, either the district court or the North Carolina court must consider the facts and circumstances relating to the State's decisions to strike eleven black jurors, along with any other relevant evidence.

### D.

Relying on *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court ruled that the jury instruction in Allen's case was unconstitutional.[7] *Allen v. North Carolina*, 494 U.S. 1021 (1990). The Court therefore vacated the sentence and remanded the case to the North Carolina Supreme Court for reconsideration in light of *McKoy*. *Allen*, 494 U.S. at 1021. On remand, the North Carolina Supreme Court concluded that the jury poll effectively cured the unconstitutional instruction and that the instruction was harmless error beyond a reasonable doubt. *State v. Allen*, 417 S.E.2d 227, 228 (N.C. 1992). The court

---

[7] In *McKoy*, the Court held that a jury instruction identical to the one in Allen's case was unconstitutional because the "unanimity requirement . . . prevent[s] the sentencer from considering all mitigating evidence." 494 U.S. at 435.

16

stated, "It appears from this poll that the jury was unanimous as to each of the mitigating circumstances which the jury failed to find. No juror would likely have considered such a circumstance in his or her determination as to imposing the death penalty if the charge had been correct on this feature of the case." *Allen*, 417 S.E.2d at 228.

Allen asserts that the North Carolina Supreme Court's finding that the jury poll cured the unconstitutional instruction is not harmless error. The district court, although eventually rejecting this claim on the merits, granted a certificate of appealability with respect to it. Thus, the district court recognized that Allen had made a substantial showing of the denial of a constitutional right. *See Slack v. McDaniel*, 529 U.S. at 483. Because Allen has made this showing, we proceed directly to consider the merits of Allen's contention. We agree with Allen that the jury poll did not cure the unconstitutional instruction, and we reverse and remand on this issue.

The jury poll in this case neither instructed the jury nor amended an instruction. It merely confirmed a juror's vote based on the instructions already given by the court. Because the instructions themselves were unconstitutional, the poll merely confirmed that each juror followed these instructions in sentencing Allen to death. Thus, the poll alone could not possibly cure the error.[8]

---

[8] The dissent makes much of the fact that each juror was polled as to whether the recommendation of death was "still your recommendation." In answering this question, a juror who initially relied on the unconstitutional instruction might reconsider his or her vote. Because each juror answered the question in the affirmative, the dissent finds that the question cured the instruction. As explained above, however, the poll was based on the unconstitutional instruction, and so it did not afford jurors the opportunity to reconsider their verdict. Even if it did, there is a world of difference between a jury's cloistered deliberations and an individual's extemporaneous answer in open court. While each juror answered "yes" when asked for an immediate response on the record, it is reasonably possible that at least one juror would have changed his or her vote if given the time to study the issue, along with the proper jury instruction, in private. As such, even if the dissent's interpretation of the jury poll answers were correct, those answers do not support a finding that the unconstitutional instruction was harmless beyond all reasonable doubt.

17

Even more, the poll questions and responses in this case were ambiguous. *See, e.g.*, *Price v. North Carolina*, 512 U.S. 1249, 1249-52 (Blackmun, J., concurring).[9] Each time a juror was polled, he or she was asked, "Do you *unanimously* find . . . ." (Emphasis added). Black's Law Dictionary defines "unanimous" as "arrived at by the consent of all." Black's Law Dictionary 1525 (7th ed. 1999). Therefore, the questions ask whether each juror agreed that they *collectively* found each mitigating circumstance, not whether each juror individually found each of the mitigating circumstances. Similarly, the jurors' responses were ambiguous. For example, the answer "No" could mean that *not all of the jurors* agreed that a mitigating circumstance existed or that *no juror* found that a mitigating circumstance existed.

The poll was further muddled by the inclusion of language from the verdict form, which not only specifically asked, "Do you *unanimously* find from the evidence the existence of one or more of the following mitigating circumstances?" but also stated, "In the space after each mitigating circumstance, write `yes,' if you *unanimously* find that mitigating circumstance by a preponderance of the evidence. Write, `No,' if you do not *unanimously* find that mitigating evidence." (J.A. at 137) (emphasis added). When the clerk polled each juror, she read the entire verdict form to each juror, including the above language, before asking for the juror's "individual" verdict. (*See* J.A. at 99-135.)

Finally, even if the jury poll proved that no juror considered any mitigating circumstance, this fact would not cure the *McKoy* error in this case. For example, when the jury failed to unanimously find that Allen had "no significant history of prior criminal history," each juror was precluded from considering this factor when deciding whether to

---

[9] In *Price*, Justice Blackmun concurred in the Supreme Court's grant of certiorari on other grounds, but wrote separately to reject the North Carolina Supreme Court's finding of harmless *McKoy* error based on a jury poll very similar to the one at issue in the instant case. Justice Blackmun explained, "The poll tells us nothing about how the juror would have voted — either on a particular mitigating circumstance or on the ultimate life-or-death question — had he been instructed that he could give effect to all the mitigating evidence, as the Constitution requires." 512 U.S. at 1251.

18

impose the death penalty, pursuant to the court's erroneous instructions. The jury poll, then, could only prove that each juror followed the instruction and did not consider this mitigating circumstance. The poll responses shed no light on the question that is at the heart of *McKoy*: whether any individual juror would have considered this factor, if properly instructed. Moreover, in 1985, when Allen was sentenced, the trial court was not on notice that the instruction was unconstitutional; *McKoy* had yet to be decided. Thus, the poll was not designed to, nor did it cure the unconstitutional instruction.

For the reasons stated above, we find that the unconstitutional jury instruction was not harmless error beyond a reasonable doubt. Accordingly, we vacate Allen's death sentence and remand this case to the district court with instructions to issue a writ of habeas corpus releasing Allen from his sentence of death, unless the State of North Carolina commences proceedings to re-sentence him within a reasonable time. *See Antwine v. Delo*, 54 F.3d 1357, 1371 (8th Cir. 1995).

IV.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. We remand the case to the district court for proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART,
VACATED, AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

In reversing the district court's judgment denying Allen's petition for writ of habeas corpus, the majority has concluded (1) that Timothy Allen made a *prima facie* showing that his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), were violated during jury selection in his State-court trial, and (2) that the error in the jury verdict form and instructions in connection with it for the sentencing phase of Allen's trial, which the North Carolina Supreme Court had found to be in error, but harmless error, under *McKoy v. North Carolina*, 494 U.S. 433 (1990), was in fact not harmless error. The majority has ordered the district court to conduct a hearing on the *Batson* issue or to require

19

the State court to conduct the hearing to permit the government to proffer a race-neutral explanation for its exercise of its peremptory challenges. It has also directed the district court, in light of the *McKoy* error, to issue the writ of habeas corpus unless the State court resentences Allen. Thus, the majority has concluded that if a new trial is not granted as a result of the *Batson* hearing, at least a new sentencing will be required.

On both issues, I believe that the North Carolina Supreme Court's decision was well within the range of being a reasonable application of federal law as interpreted by the Supreme Court. Accordingly, I would affirm the district court's judgment denying Allen's petition for a writ of habeas corpus, and therefore I dissent. My reasons follow.

I

This is a capital murder case in which Timothy Allen was charged with, and convicted of, shooting a North Carolina State trooper in 1985 and given the death penalty. Allen is an African-American.

During jury selection, 65 venirepersons were called for consideration as potential jurors, of which 24 were African-Americans. The State exercised 13 peremptory challenges in selecting the trial jury panel and two alternates, leaving unused three challenges available to it. During the process, the State accepted 7 African-Americans and exercised peremptory challenges against 11 African-Americans. The jury as empaneled consisted of seven African-Americans and five whites, and the two alternates were white. Later during the trial when one of the African-Americans on the jury was excused, the court replaced her with the first alternate so that the case was ultimately decided by a jury of six African-Americans and six whites.

The record of the trial indicates that the jury-selection process was careful, deliberate and rational, and all of the questioning by the attorneys and the rulings by the court focused on the appropriate criteria for picking a fair and impartial jury. The process began by seating 12 venirepersons in the jury box on November 4, 1985, and having the lawyers question those jurors as a group and individually. The original panel, selected at random, consisted of five African-Americans

20

and seven whites. As each juror was excused either for cause or as the result of a peremptory challenge, another venireperson was placed in that juror's seat. For the next six to seven court days, the jurors were questioned, replaced, and new jurors questioned. At the end of the process, the jury panel consisted of seven African-Americans and five whites. There is no evidence in the approximately 1,000 pages of transcript covering jury selection that suggests any race-based questions, motives, or conduct. And no suggestion was made by either party that the other was striking jurors based on race. At the end, the court repeatedly asked counsel if the process was appropriate and whether any problems were created: "Before we impanel the jury I wanted to make certain after conferring with all lawyers that there was nothing that needed to be brought to my attention or if there was any problem that existed." Counsel for Allen stated, "We know of nothing, Your Honor, except I would say this . . . ," and counsel then raised an objection about the prosecution's placement of evidence on the table. After that was addressed, the court again asked counsel, "Is there anything that needs to go on the record before the jury is impaneled for the defense?" Counsel for the defense responded, "No, Your Honor."

During the entire week-long jury selection process, Allen made no objection that the State discriminated against African-Americans in exercising peremptory challenges, and therefore he saw no reason to undertake to make out a *prima facie* showing of discrimination that would have permitted the State "to come forward with a neutral explanation for challenging black jurors" and the court to remedy any problem. *Batson*, 476 U.S. at 97. Even though the *Batson* case had not yet been decided by the Supreme Court, it was pending in that Court, and the State asserts that the parties were aware of that fact.

For the first time on appeal, however, Allen contended that the State's exercise of peremptory challenges against nine of eleven African-American jurors denied him equal protection. Noting an absence of any explanation in the record for the State's use of its peremptory challenges, Allen made a statistical argument to the North Carolina Supreme Court as follows:

> In this case, 65 prospective jurors were examined, including the examination of alternates: 37 whites, 24 blacks, 1

21

Indian, and three whose race is unknown. Of these, 14 were selected and 51 were excused: 22 by the Court for cause; 16 by the defendant peremptorily; and 13 by the prosecution peremptorily. Of the 13 jurors excused by the State, all but two were black. The final panel consisted of seven black and five white jurors, with two white alternates. During trial, the trial court removed the black juror in seat number 10 (Mrs. Johnson) and replaced her with the first alternate.

Allen asserted that these statistics and the voir dire of the jury created a *prima facie* case, but he points to no evidence from the voir dire to support this assertion.

The State argued to the North Carolina Supreme Court that Allen knew of the *Batson* argument during trial and did not make any objection. The State claimed that by raising the issue two years later for the first time on appeal, it was "sandbagg[ed]," being denied the evidence that would have explained its exercise of its peremptory challenges:

> The defendant contends that he is entitled to raise this issue on appeal even though he failed to object at trial. If there ever was a case of "sandbagging," this is it. If you do not object to the peremptory excusing of jurors until two years later, then only the cold record is available for the use of the peremptory challenges. The District Attorney has no opportunity to explain why he did not like any of the jurors he excused. The District Attorney probably does not keep notes of why he excused particular jurors, so if a hearing was held, he would have no knowledge of a particular juror since he has tried hundreds of cases since that time.

Additionally, the State argued that the statistics did not make out a *prima facie* case. It pointed out that "[o]f the 15 black veniremen tendered to the State, it accepted 7, or 47%"; that the jury as selected consisted of 58% African-Americans; and that at that time the population of Halifax County, from which the jury was drawn, was 48% African-American. The State also made an effort to reconstruct the reasons for its exercise of the peremptory challenges against African-Americans, noting that one important consideration given was whether any potential juror had a son because such a juror would

22

empathize with Allen and his mother. The record of voir dire supports the State's assertion. The State further claimed that almost all of the African-Americans stricken "met the same pattern." Thus, with respect to juror Jacqueline Davis, who the majority has suggested was stricken because of race, the State pointed out to the North Carolina Supreme Court that Davis had a son. Tr. at 353. Davis also knew one of the defense attorneys, who was a customer at the Davis store and to whom she referred as "Steve."

The North Carolina Supreme Court rejected the *Batson* challenge based on the facts that (1) "the State accepted seven of the seventeen black veniremen tendered" and (2) "the majority of the jury which tried the defendant was black." *State v. Allen*, 372 S.E.2d 855, 862 (N.C. 1988). The court concluded that in the circumstances where the State "accepted seven or forty-one percent" of the African-American members of the venire, an "inference" of racial motivation did not arise, and the defendant failed to make a *prima facie* case that the State's peremptory challenges were racially motivated. *Id*. Allen did not appeal this ruling to the United States Supreme Court in his petition for a writ of certiorari.

In his petition for a writ of habeas corpus filed in this case, Allen again raised the *Batson* issue, proffering only statistical evidence. After examining the record and the North Carolina Supreme Court's disposition of the *Batson* claim based on the record, the district court concluded:

> Examining this claim based upon the clearly established federal law existing in 1988, this court finds that the North Carolina Supreme Court's adjudication of this claim is neither contrary to nor an unreasonable application of *Batson*. *Batson* did not establish a mathematical formula to be applied but rather instructed that the trial courts were to consider "all relevant circumstances" surrounding the jury selection process. [Citation omitted]. Allen has failed to establish that the North Carolina Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, *Batson*.

23

On this record, I would affirm the district court's ruling. The burden of establishing a *prima facie* case under *Batson* falls on the defendant, *see Batson*, 476 U.S. at 96-97, and based on the record in this case, Allen never carried that burden. Therefore, I agree with the district court's conclusion that the North Carolina Supreme Court's decision to reject Allen's *Batson* claim raised for the first time on appeal was not an "unreasonable application" of *Batson*. *See* 28 U.S.C. § 2254(d)(1).*

Of course, the standard that Allen must now meet is not whether the North Carolina Supreme Court was right. That issue was available to him on direct review to the Supreme Court. The standard on collateral review of a State decision challenged through federal habeas corpus requires that the federal court deny the writ unless the State's adjudication of the particular issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly estab-

_____

*The majority states that Allen has preserved his *Batson* objection "by filing a pretrial motion focusing on the state's history of excluding black jurors." The motion to which the majority refers is a July 1985 motion by Allen to increase the number of peremptory challenges available to him. One of the five grounds that Allen argued in support of this motion was that, based on the prosecutor's past "propensity toward excluding blacks from trial juries by use of his peremptory challenges," Allen "expect[ed] that the Prosecutor will follow that practice in this case." Just prior to the beginning of jury selection on November 4, 1985, the trial court denied Allen's motion. After the jury selection process resulted in a jury that was 58% African-American, Allen did not make any *Batson* objection, even after the trial judge twice asked if there were any objections that should be noted on the record. That Allen dutifully made an "anticipatory" *Batson* objection in July 1985 but did not make any objection based on the *actual* conduct of the prosecutor during the November 1985 selection of a 58% African-American jury does not persuade me that Allen has preserved his objection. To the contrary, Allen's decision not to "renew" his anticipatory *Batson* objection based on the actual conduct of the prosecutor is compelling evidence that he did not, in fact, find the jury selection process to be tainted with racial bias. I would conclude, therefore, that any *Batson* claim was waived in this case. *See Lockett v. Anderson*, 230 F.3d 695, 706 (5th Cir. 2000); *McCrory v. Henderson*, 82 F.3d 1243, 1249-50 (2d Cir. 1996); *Wilkerson v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992). But because the majority holds that Allen did not waive his claim, I address the merits of his claim under *Batson*.

24

lished Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In determining whether an application of Federal law is unreasonable, the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000), stated:

> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

In *Batson*, the Supreme Court articulated the "evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury." 476 U.S. at 82. To carry his burden, a defendant must show (1) that "he is a member of a cognizable racial group"; (2) that the "prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used [the peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* at 96; *see also Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998), *cert. denied*, 527 U.S. 1011 (1999). *Only after the defendant* makes a showing sufficient to raise an "inference of purposeful discrimination" is the State required "to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 96-97.

In this case, the *only* facts that Allen identified to support an inference of purposeful discrimination were raw statistics about the racial make-up of the venire and those excluded from the jury through peremptory challenges. He has presented no other circumstantial facts that "raise an inference" that the State was discriminating against African-Americans in exercising its peremptory challenges. Indeed, the State has pointed out that its voir dire of the venire was the same

25

for African-Americans as it was for whites, and it points out that the circumstances revealed by answers to its voir dire as to each juror justified its exercise of peremptory challenges on racially neutral grounds.

Moreover, the only "pattern" that I can discern from the raw statistics that Allen has produced suggests that the State did *not* exercise its peremptory challenges on the basis of race. We know, for instance, that with respect to Seat 1, Seat 4, and Seat 8, on which the State exercised a majority of its peremptory challenges to African-Americans, the State ultimately accepted an African-American to sit on the jury in each of those seats. Indeed, with respect to Seat 10, after the State exercised a peremptory challenge against a white and after Allen exercised peremptory challenges against two whites, the State accepted the first African-American slotted for that seat. When the first person seated in Seat 7 was an African-American, the State accepted the juror. On Seat 2, after a white was challenged for cause, the State accepted the replacement African-American. On Seat 6, when the State exercised a peremptory challenge against a white, an African-American replaced the white and the State accepted the juror. In accepting these African-American jurors, the State left unused peremptory challenges that were available to it. Only on Seat 3 did the State's exercise of a peremptory challenge result in the race of a juror changing from African-American to white. I conclude that this "pattern" supports an inference that discrimination against African-Americans was not a reason for the State's exercise of peremptory challenges. And in the absence of any other circumstantial evidence, I cannot conclude that Allen carried his burden of making a *prima facie* showing. More relevant to the inquiry now, Allen has failed to establish that the North Carolina Supreme Court's application of *Batson* on this record was an unreasonable one. Therefore, I conclude that the district court correctly rejected Allen's *Batson* challenge.

The majority faults the North Carolina Supreme Court for considering the statistical make-up of the impaneled jury in determining whether a *Batson* violation occurred and for failing to consider any of Allen's evidence of discrimination. *Ante*, at 10-11. The majority asserts that the North Carolina Supreme Court "should have focused on those members of the venire who were *excluded* from the jury." *Ante*, at 11. It then reiterates Allen's statistical argument and con-

26

cludes that "Allen's evidence of discrimination is compelling." *Id.* To support this conclusion, the majority recites Allen's evidence in its entirety:

> Out of 66 prospective jurors on the venire, 38 (57.5%) were white, 24 (36.3%) were African American, and 4 (6%) were of another race. (J.A. at 57.) The prosecution used 84.6% of its peremptory challenges to exclude African Americans from the jury, even though African Americans only represented 36.3% of the venire presented.

*Id.*

The use of these raw statistics, however, is both selective and uninformative. For example, the statistics as used do not account for the fact that the State exercised its peremptory challenges in a selective manner that reshaped the original panel seated, which had five African-Americans, into a jury of seven African-Americans. As I noted above, most of the State's peremptory challenges were exercised on the selection of jurors to fill three seats, and the State ultimately accepted an African-American in each of those seats. I suggest that selective statistics just as well demonstrate the opposite inference. For example, the percentage of African-Americans accepted by the State and seated on the jury — 58% (7 of 12) — exceeded the percentage of African-Americans on the venire — 37% (24 of 65) — and exceeded the percentage of African-Americans in the county — 48%.

Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply. The statistics relied upon by Allen, and upon which the majority commands a "focus," do not tell the whole story or even an accurate story in this case. As I have already described in greater detail, the majority of the State's peremptory challenges against African-American venirepersons were exercised with respect to seats for which the State ultimately accepted an African-American juror. And there was only one seat on which the race changed from African-American to white as a result of the State's peremptory challenge. The end result was that from a venire consisting of 37% African-Americans, the State accepted a jury of 58% African-Americans.

27

Perhaps out of concern that the statistical evidence proves nothing, the majority engages in its own factfinding, comparing the circumstances of venireperson Jacqueline Davis, an African-American, with those of venireperson Mildred Thorne, who was white. Davis was peremptorily stricken by the State and Thorne was not. The majority concluded that because both Davis and Thorne knew defense counsel and both seemed to respond similarly to questions about the death penalty, there was nothing to justify the State's treating them differently for purposes of exercising peremptory challenges. This comparison led the majority to conclude that the "decision to keep Juror Thorne is particularly suspect when compared to the prosecutor's decision to strike Juror Davis." The majority then leaps from this suspicion into a factual finding that the evidence showed that "race was a factor in the prosecution's use of peremptory challenges."

As a preliminary matter, I note that the comparison of these two particular jurors was not urged by the litigants but was initiated by the majority on the cold record. In fact, the majority's comparison derogates from Allen's strenuous argument in his reply brief that "this Court cannot evaluate" the State's reasons for dismissing jurors "on a cold record," and that any attempt to do so would be "speculation." Indeed, an examination of the comparison suggests that only speculation supports the majority's conclusions. First, it must be recognized that the State's reasons for exercising peremptory challenges were never elicited on the record because no objection was ever made. The majority never acknowledged the possibility of race-neutral factors on which the State could have legitimately relied. But even based on the record, the majority fails to acknowledge the State's reconstruction of its reasons on its direct appeal to the North Carolina Supreme Court. In its explanation to that court, the State observed that juror Davis had a son, *see* Tr. at 353, making her a person who might be empathetic to Allen and his mother. The State pointed out that this mother-son relationship was an important consideration that formed its decisions to exercise peremptory challenges. Juror Thorne did not have a son. Finally, the majority did not consider the fact that even though the State exercised a peremptory challenge to strike Davis, it ultimately accepted an African-American as the juror in her seat.

The majority's comparison of two jurors, totally out of context and without the data necessary to make an informed comparison, amounts

28

to rank speculation and implicitly confirms that, without the aid of such speculation, Allen has not otherwise presented evidence sufficient to raise an inference of race-based discrimination. Without any evidence of improper statements or questions, the statistical evidence considered more fully can hardly be found to evidence a pattern of the State exercising peremptory challenges to eliminate African-Americans from the jury.

In sum, while we need not resolve whether the North Carolina Supreme Court "got it right" in concluding that Allen failed to make a *prima facie* showing, there can be little doubt that its application of the *Batson* principles cannot be found to be an unreasonable one on this record.

## II

During the sentencing phase of trial, the State trial court submitted a form to the jury which, together with the trial court's instructions, instructed the jury that it could find or reject mitigating circumstances only by a unanimous vote. Of ten mitigating circumstances submitted to the jury, the jury found unanimously that three existed and seven did not. The jury then found unanimously that these mitigating circumstances were "insufficient to outweigh the aggravating circumstance or circumstances" and that the aggravating circumstances, considered in light of the mitigating circumstances, were "sufficiently substantial" to call for the imposition of the death penalty.

The United States Supreme Court granted a writ of certiorari and, in light of its decision in *McKoy v. North Carolina*, 494 U.S. 433 (1990), vacated the judgment in this case and remanded it to the North Carolina Supreme Court for reconsideration of this case in light of *McKoy*. *Allen v. North Carolina*, 494 U.S. 1021 (1990).

The North Carolina Supreme Court reconsidered the trial record and found that the jury form and instructions had indeed violated the principles of *McKoy* but that, in light of a jury poll that had been conducted by the trial court, the error was "harmless beyond a reasonable doubt." *State v. Allen*, 417 S.E.2d 227, 228 (N.C. 1992). The United States Supreme Court denied Allen's petition for a writ of certiorari

29

to review the North Carolina Supreme Court's decision on reconsideration. *Allen v. North Carolina*, 507 U.S. 967 (1993).

Allen raised the *McKoy* issue again in the district court on a petition for writ of habeas corpus, and the district court concluded that the North Carolina Supreme Court's decision was not an unreasonable application of federal law. Accordingly, it denied the writ.

In *McKoy*, the Supreme Court applied its decision in *Mills v. Maryland*, 486 U.S. 367 (1988), to hold that the requirement in North Carolina that a jury find mitigating evidence by a unanimous verdict violates the U.S. Constitution "by preventing [each juror as] sentencer from considering all mitigating evidence." 494 U.S. at 435. If a unanimous verdict on mitigating evidence were required, then only one juror could foreclose others' consideration of mitigating evidence, thus denying each juror the possibility of considering the mitigating evidence in casting a vote for the death penalty. *Id.* at 443. The Court explained that "[t]he unanimity requirement thus allows one holdout juror to prevent the others from giving effect to evidence that they believe calls for a sentence less than death." *Id.* at 439 (internal quotation marks and citations omitted). In sum, the Court concluded that "*each juror* must be allowed to consider all mitigating evidence in deciding . . . whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death." *Id.* at 443 (emphasis added).

Applying *McKoy* to the circumstances in this case, the North Carolina Supreme Court concluded that the verdict form and the instructions given in connection with it violated the principles of *McKoy* and therefore constituted trial error. But the error, it found, had no effect on the trial because the trial court conducted a poll of the jurors which revealed that *the individual* jurors' votes were "unanimous as to each of the mitigating circumstances which the jury failed to find." *Allen*, 417 S.E.2d at 228. The court held that the error, therefore, "was harmless beyond a reasonable doubt." *Id.*

Because I conclude that the North Carolina Supreme Court's decision was a correct application of federal law, *a fortiori*, I conclude that it was at least a reasonable approach, the standard that we must

30

apply to recognize the deference specified by Congress. 28 U.S.C. § 2254(d)(1).

A closer look at the process followed by the trial court reveals that the *individual vote* of each juror can be determined on the record with respect to each mitigating circumstance. Because the individual juror votes on the mitigating circumstances were unanimous, the unconstitutional possibilities that could result from a *McKoy* error never happened in this case. If the trial court had relied only on the verdict form returned by the jury, I would agree that we could not determine whether or not the *McKoy* error had tainted the verdict because we could not determine whether one juror or a few jurors had frustrated the finding of mitigation by other individual jurors so that the others could not consider their finding of mitigating evidence in voting on the death penalty. But the trial court's poll removed any doubt on this issue.

After the jury returned its verdict and the clerk read it in open court, the trial judge conducted a poll instructing the jury as follows:

> Members of the jury, at this time I am going to ask that Madam Clerk, when she is ready, poll each of you. This is the same procedure that we used on Monday. *You will be asked individually* as to your answers to the issues and as to the recommendation.

(Emphasis added). Each individual juror was then polled on the verdict form, including the answers to each of the mitigating circumstances, and asked, "Are these the answers to your issues" and "And do *you* still assent thereto?" (Emphasis added). In each case, the juror said "yes." Then each individual juror was asked whether the recommendation of the death penalty was "still *your* recommendation" (emphasis added) and whether the individual juror "still assent[ed] thereto." Again, in each case, the juror responded that this was his or her individual recommendation. Because each juror *individually* indicated that the vote on the ten mitigating factors was also his or her individual vote, the verdict on the mitigating factors was in fact unanimous, and the *McKoy* error did not deny any juror the opportunity to consider his or her individual finding of a mitigating circumstance.

31

Accordingly, I would conclude that the decision of the North Carolina Supreme Court finding the *McKoy* error harmless was not an unreasonable application of federal law. The court clearly understood the holding in *McKoy*, and it determined whether any individual juror's views on mitigating evidence were suppressed by the unanimity requirement, concluding that no individual juror's view on a mitigating circumstance was over-voted.

Accordingly, I would affirm the district court's decision denying Allen's petition for a writ of habeas corpus in every respect.

32