**PUBLISHED**

**Filed: June 4, 2004**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TIMOTHY LANIER ALLEN,
            *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
            *Respondent-Appellee.*

No. 02-5

---

## ORDER

---

On the Respondent's Petition for Rehearing by the *en banc* panel, Judges Wilkinson, Niemeyer, Luttig, and Williams voted to grant the petition, and Chief Judge Wilkins and Judges Michael, Motz, Traxler, King, Gregory, and Shedd voted to deny the petition. The Petition for Rehearing is therefore denied. Judge Luttig wrote an opinion dissenting from the denial of the Petition for Rehearing.

Judges Widener and Duncan did not participate in the decision.

For the Court,

/s/ Patricia S. Connor
            Clerk

LUTTIG, Circuit Judge, dissenting from the denial of rehearing:

Timothy Lanier Allen murdered North Carolina State Trooper Raymond E. Worley in cold blood, by shooting him three times at point-blank range — once through the head — and leaving him slumped over alongside the road, literally to drown in his own blood. For this

murder, a jury of North Carolina citizens sentenced Allen to death. Now, almost nineteen years after Allen's murder of Trooper Worley and almost eighteen years after the jury of Allen's peers sentenced Allen for his crime, this court has invalidated Allen's sentence on nothing more than its unexplained speculation that some juror might have voted to sentence Allen differently had the jury not been instructed that it had to unanimously find the following inconsequential (if not affirmatively damaging) "mitigating" factors in order to consider them in sentencing Allen:

> Timothy Allen was only 30 years old when he murdered Trooper Worley.

> Timothy Allen's multiple previous convictions were only for shoplifting, breaking and entering, and burglary.

> Timothy Allen was raised in a single-parent home, by only his mother and grandmother.

> Timothy Allen is the father of three sons.

> Timothy Allen supported one of his three sons.

> Timothy Allen "remained employed" when he was not in prison.

> Timothy Allen's parents had a fight at Allen's third birthday party.

This, in the face of the fact that the jury did find unanimously the three contrastingly *non*frivolous mitigating factors that Allen had genuine remorse for the murder; that he had achieved while incarcerated; and that he had no history of crime involving deadly weapons, *and nonetheless decided to sentence Allen to death, given the heinousness of his murder of Trooper Worley.*

Not only does the majority's decision defy common sense and insult the men and women who served on the jury in this case, it so distorts the harmless error inquiry required of federal courts conduct-

ing habeas review under *Brecht* v. *Abrahamson*, 507 U.S. 619 (1993), as to render that inquiry all but meaningless in future cases. It is for these reasons that I dissented from the court's judgment on the *McKoy* issue when the *en banc* decision issued (in abbreviated form because of the court's extraordinary delay in deciding the case). *See* Slip Op. at 53-55 (4th Cir. 2004). It is for these reasons that I dissent now, with full opinion, from the denial of rehearing with respect to that judgment.

I.

Despite the fact that *en banc* reargument took place in this case almost a year ago and the deadline for deciding this case had long since passed by the time it issued its opinions, the court failed to produce an opinion clearly explaining to the State of North Carolina its reasons for setting aside the death sentence that the jury of North Carolina citizens imposed eighteen years ago. Instead, the court produced a fractured array of opinions including, most notably, a plurality opinion authored by Judge Gregory on the issue presented under *McKoy* v. *North Carolina*, 494 U.S. 433 (1990), which does not even attempt the harmless error analysis required of an appellate court by *Brecht*.

The plurality does not even purport to undertake the carefully-reasoned, "individualized" reweighing of the aggravating and mitigating circumstances, against the backdrop of the specific record facts of the crime committed, which is required under *Brecht*. Instead, in a few pages that appear as afterthought in attempted justification of a result mistakenly reached before the court even understood that it was required to undertake the *Brecht* inquiry prior to granting the writ of habeas corpus, the plurality lists the aggravating circumstances in sterilized form, admittedly divorced from the actual circumstances of Allen's crime; lists the above-recited mitigating circumstances; recites only that evidence from the record that supports these mitigating circumstances, while ignoring any contrary evidence; strings together quotations from the applicable precedents; and then asserts in classic *ipse dixit* that a juror could find "any one" of the listed factors (aside from two which are so frivolous even the majority cannot bring itself to rely on them) and on the strength of that single factor decide against imposition of the death penalty. Thereafter, in empty incantation of the language from the authorities it string cites, it sim-

ply states that it cannot say with fair assurance that the jury would not have sentenced Allen differently had it been properly instructed that it could consider the mitigating circumstances listed.

With that, and nothing more, the plurality sweeps away the sentence imposed on Allen by the citizens of North Carolina almost two decades ago. Such a substantively meaningless harmless error review betrays that the court has yet to give any more thought to the question of the harmfulness of the instructional error in this case under *Brecht* than the original panel had given the question at the time that it filed its opinion granting the writ of habeas corpus without so much as a mention of *Brecht* or, for that matter, even of the requirement for harmless error review under *Brecht* before a writ of habeas corpus may be granted in cases such as this. *See Allen* v. *Lee*, 319 F.3d 645, 656-58 (4th Cir. 2003).

A.

In order to hold, as the plurality does here, that a faulty jury instruction had a "substantial and injurious effect or influence on the jury's verdict" sentencing a defendant to death, "the court must determine what the sentencer would have done absent" the error. *Stringer* v. *Black*, 503 U.S. 222, 230-31 (1992). Thus, the court *must* compare (1) the aggravating and (2) mitigating evidence which the jury did consider, (3) to the particular evidence which the jury was prevented by the faulty jury instruction from considering and (4) then analyze whether, and to what extent, that evidence would have affected or influenced the verdict eventually reached by the jury. *See*, *e.g.*, *Boyd* v. *French*, 147 F.3d 319, 327-28 (4th Cir. 1998); *Horsley* v. *Alabama*, 45 F.3d 1486, 1492-93 (11th Cir. 1995). The Supreme Court could not have been any clearer that, in conducting this analysis, "[w]hat is important . . . is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *See Barclay* v. *Florida*, 463 U.S. 939, 958 (1983) (emphasis in original) (instructing state courts conducting harmless error analysis at the sentencing stage of capital trials).

Despite the simplicity of this analytical framework and the clarity of the Supreme Court's directive, the plurality does not even purport

to make "individualized" findings of the kind mandated by the Supreme Court — none.

Nowhere in its opinion does the plurality even describe the actual circumstances of Allen's murder of Trooper Worley, without which it is not even possible to begin to conduct *Brecht*'s harmless error inquiry.[1]

Nowhere in its opinion does the plurality discuss even a single one of the five mitigating factors that were foreclosed from the jury's consideration, each one of which the plurality deems to be "colorable" in its reasonable potential to affect the jury's sentencing decision. And it only selectively recounts the evidence from the record that would support these factors, omitting altogether the substantial record evidence that undermines the mitigating quality of the little evidence that it does recount.

Needless to say, nowhere in its opinion does the plurality even purport to assess the effect that any single one of the foreclosed mitigating factors would have had, when balanced against the true weight of the aggravating factors that supported the jury's sentence of death; the plurality simply states, without even a sentence of reasoning aside from conclusory statements about the ways in which these factors highlighted Allen's "redeeming qualities," that "any one" of the five mitigating factors may have swayed the jury's verdict, Slip Op. at 45 — necessarily including, for example, the factors that the defendant "remained employed when not incarcerated" and that Allen's parents had a fight at his *third* birthday party, twenty-seven years prior to his murder of Trooper Worley.[2]

---

[1]Even as to the statutory aggravators, the plurality says no more than that the crime was "terrible," and that these aggravators were "exacerbating." Slip Op. at 44-45.

[2]Chief Judge Wilkins, in his separate concurring opinion, does not, himself, repeat the sweeping statement that "any one" of the foreclosed mitigators might have supported a vote in favor of a life sentence. In his opinion, Judge Wilkins rests instead on the argument that "[a] reasonable juror could have concluded that Allen should be spared from the death penalty so that his children would not lose their father." Slip Op. at 19. Although this may be thought a narrower argument and opinion for pur-

And, although it would perhaps go without saying, given that the plurality does not even describe the crime for which Allen was convicted and sentenced, nowhere in its opinion does the plurality even attempt to balance any of the aforementioned mitigating and aggravating factors together with the particulars of the crime committed by Allen.

Confirmation of the fact that the plurality undertakes no balancing of the mitigating circumstances that it holds could support a different verdict, against the aggravating factors, is found in the completely opposite treatment that it accords two mitigating factors that it holds would not have affected the jury's verdict. With respect to the submitted mitigating factor regarding Allen's age, for example, the court undertakes a full and analytically sound discussion, ultimately concluding that "a person of thirty cannot reasonably be characterized as too young to appreciate the seriousness of his crime," and therefore that no reasonable juror would have voted to spare Allen's life on the basis of Allen's age. *See* Slip Op. at 43. Absent is any such discussion of even one of the mitigating factors that the plurality holds *could* have substantially swayed the jury's verdict.

That the plurality does not meaningfully discuss even a single one of these relevant considerations — a detailed discussion of each of which is essential to the *Brecht* analysis — itself confirms that its disposition not only is not, but could not possibly be, based on a reasoned reweighing of the aggravating and mitigating factors in light of the entirety of the record facts, as required under *Brecht*. Rather, the plurality ultimately conducts its harmlessness analysis as if in a funhouse mirror, with the aggravating factors minimized to a fraction of their true size due to the plurality's failure even as much as to describe Allen's crime, and the mitigating factors magnified to a multiple of their size due to the plurality's selective recitation of the record evidence. These distortions alone, which are hopelessly unfaithful to "the individualized treatment" that is required, render the

poses of this case, than the plurality's argument and opinion, which Judge Wilkins inconsistently joins, this argument is in actuality the most far-reaching and detrimental argument for our court's future harmless error jurisprudence of any made by any member of the court in this case.

plurality opinion unmistakably in conflict with Supreme Court precedent.

## B.

But the plurality's conclusory holding of harm *under the peculiar facts of this case* produces an opinion even more fundamentally flawed than one that simply fails to make the required "individualized" weighing of the respective aggravating and mitigating factors in light of the totality of the record facts. The core of the plurality's explanation that the faulty jury instruction resulted in "actual prejudice" to Allen, such as it is, reads in full as follows:

> [E]ven if eleven jurors agreed that five non-unanimous mitigating factors were present, under the unconstitutional jury instruction they could have found *no* additional mitigating circumstances. Thus, instead of those eleven jurors weighing eight mitigating circumstances against the two aggravating factors, they were only permitted to weigh the three mitigating circumstances on which they were unanimous. Recognizing that all aggravating and mitigating factors do not warrant the same weight, and that jury deliberations are an inexact science at best, this means that a possible fifty-five additional votes (eleven jurors times five factors) could have been cast in favor of mitigation. *Any one of these fifty-five possible votes could, in turn, have formed the basis for a decision against the imposition of the death penalty.* When the substantial evidence presented is evaluated in light of the broad discretion conferred on jurors in capital sentencing proceedings, we find ourselves unable to say, as we must to uphold a sentence of death, that *none* of the jurors would have been persuaded to vote for life imprisonment instead. After all, it only takes *one hold-out juror* to prevent the imposition of the death penalty, and, in this case, we cannot say with 'fair assurance' that no juror would have been swayed by the mitigating factors that the jurors were unlawfully precluded from individually considering, including the highly discretionary catch-all factor, particularly when combined with the unanimously found mitigating factors.

Slip Op. at 45-46 (emphases added).

It is clear from these paragraphs that the plurality does not merely fail to rest its conclusion of harm on "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." It rests its conclusion exclusively on the polar opposite of the individualized determination required — a *generalized* view that *any* mitigating factor foreclosed from jury consideration, if not obviously frivolous (like Allen's age), is *per se* substantially injurious to the jury's verdict under *Brecht*, because *any* one juror could conceivably find *any* one such mitigating factor and, on the basis of that factor, refuse to sentence the defendant to death. In other words, the plurality rests its conclusion on the premise that jury deliberation is a game of random chance, that jurors are entitled to base their votes on considerations other than the evidence — even irrational considerations, in this case such as that Allen's parents fought at his third birthday party, twenty-seven years ago — and thus that any factor that is foreclosed from the jury is necessarily prejudicial. That this is the underlying rationale of the plurality's opinion is clear from its concluding observation that "[i]t only takes *one hold out juror* to prevent the imposition of the death penalty," coupled with its earlier pronouncement that "*any one* of the[ ] fifty-five [potentially foreclosed] votes could, in turn, have formed the basis for a decision against the imposition of the death penalty." Slip Op. at 45-46 (emphases added).[3]

---

[3]So as to leave no doubt as to its holding in this regard, the plurality even showcases three cases in which North Carolina juries sentenced defendants to life imprisonment even though their crimes were especially heinous and shocking to the public conscience, including (i) one in which a defendant had been convicted of first-degree murder after killing a victim during the course of a rape, *see State* v. *McKinnon*, 403 S.E.2d 474, 475 (N.C. 1991); (ii) one in which a defendant had been convicted of first-degree murder after he enticed a victim away from a shopping mall, forced her at knife-point to perform oral sex on him, and then stabbed her repeatedly, *see State* v. *Franklin*, 304 S.E.2d 579, 580-82 (N.C. 1983); and (iii) one in which a defendant had been convicted of first-degree murder after stabbing his wife to death in front of the couple's children, *see State* v. *Wilds*, 515 S.E.2d 466, 472 (N.C. App. 1999).

In fact, of course, the plurality actually has no idea whether the sentences imposed in the cited cases are examples of irrational jury behav-

This is rejection of the reasoned decision required of an appellate court under *Brecht* when reviewing for the harmfulness of an instructional error such as that in this case. This approach cannot possibly be squared with the Supreme Court's admonition to federal courts conducting habeas review that, "[t]he State is not to be put to [the] arduous task" of resentencing a defendant, "based on mere speculation that the defendant was prejudiced by trial error." *Calderon* v. *Coleman*, 525 U.S. 141, 146 (1998) (per curiam). Neither can it be defended in light of the explicit instruction in *Kotteakos* v. *United States*, 328 U.S. 750 (1946), the very precedent from which the *Brecht* standard was derived, that, when assessing the probable effect of an error, the court must not assume generally that the jury would act without reason. *Kotteakos*, 328 U.S. at 764.

## II.

Faithful application of the *Brecht* harmlessness standard in this case can only yield the conclusion that the instructional error here was harmless. Weighing the specific aggravating factors of Allen's brutal murder of Trooper Worley with the overall circumstances of the crime, against the inconsequential, and only thinly-supported mitigating factors that were foreclosed from the jury's consideration, and

---

ior, as opposed to rational jury behavior. The published opinions to which the plurality cites report only the circumstances of the crime committed and the additional fact that a life sentence was imposed; they report nothing about the mitigating circumstances presented to the jury, and, therefore, nothing about the weighing process in which the jury ultimately engaged in order to reach the decision to impose only a life sentence. Thus, it is impossible to assess whether the juries in these cases were acting rationally or irrationally.

The plurality's citation to these cases *is* telling, however, for this reason. The plurality actually provides, *through its parenthetical descriptions*, more detail about the aggravating circumstances in these irrelevant cases than it provides about the aggravating circumstances in the one case that *is* relevant — the case presently before the court — a curiosity that is symbolic of the fundamental flaw in the plurality's opinion in this case, that it never even attempts the individualized reweighing of the aggravating and mitigating factors required under *Brecht*.

weighing these together with the mitigating factors that were unanimously found to exist but unanimously found *not* to outweigh the aggravating factors, there is a remote possibility (if any at all) that Allen's jury would have voted to spare Allen's life had they not been foreclosed from consideration of the remaining mitigating factors at issue. Such a remote possibility does not begin to satisfy *Brecht*'s requirement that the error have had a "substantial and injurious effect on the jury's verdict." *See Calderon*, 525 U.S. at 146.

A.

As I have noted, the plurality does not even believe that the facts surrounding Trooper Worley's murder are relevant to the *Brecht* analysis, a belief which, by itself, stands in testament to the fact that it has not undertaken the analysis required of us. But those facts are as follows.

On May 11, 1985, in the midst of an interstate crime spree, Allen pulled up behind the patrol car of North Carolina State Highway Trooper Raymond E. Worley in a stolen van. Trooper Worley had, only moments earlier, stopped a different stolen van — a vehicle that Allen himself had helped to hot-wire and steal — driven by Antonio Worrell, one of Allen's partners in the crime spree. After escorting Worrell into his patrol car, Worley motioned for Allen to exit from the stolen van that he was driving and approach the patrol car, which Allen did. Unbeknownst to Trooper Worley, however, Allen was armed, and, when Trooper Worley reached to unlock the patrol car door for him, Allen fired three shots at Worley at point blank range, once through the head. Allen and Worrell then left Worley on the side of the highway, slumped over in the patrol car. Literally drowning to death in his own blood, Worley died some four minutes later, leaving his wife without a husband and his two children without a father.

It was with this particular crime in mind, which the North Carolina Supreme Court described as "coldblooded, unprovoked, and unjustified," *State* v. *Allen*, 372 S.E.2d 855, 871 (N.C. 1988), that the jury unanimously found that the two aggravating factors of the murder of a law enforcement officer while he was engaged in the performance of his official duties and murder committed for the purpose of avoiding lawful arrest, had been proven beyond reasonable doubt. J.A. 102-

03. It was with this particular crime in mind that the jury unanimously found that those mitigating factors that it *had* unanimously found — that Allen had expressed remorse for the murder, that Allen had earned a GED while incarcerated, and that Allen had no history of crime involving deadly weapons — were *in*sufficient to outweigh the vileness of the murder Allen had committed, and accordingly imposed the death penalty. And it is with the details of this crime in mind that we must, in conducting harmlessness review under *Brecht*, assess the likelihood that any of the jurors would have voted to spare Allen's life, had they not been instructed that they could only weigh mitigating circumstances that they had unanimously found to exist.

### B.

The plurality believes that, because "the jury's process was carefully circumscribed by statutory dictates, limiting deliberation to *two* aggravating factors, that the murder was committed for the purpose of avoiding a lawful arrest and that the murder was of a law enforcement officer while engaged in the performance of his official duties *. . . there is no legal basis to weigh the overall circumstances of the crime outside these two factors.*" Slip Op. at 42 (emphasis added).

First, even if it were true that it is impermissible as a matter of law to consider the details of Allen's brutal crime "outside" the two aggravating factors that were submitted and unanimously found, jurors obviously would have considered the details of Allen's crime when assessing the *strength* of these two factors. Indeed, they were affirmatively required to do this, because they could not assess whether the aggravating factors in this case were "*sufficiently substantial* to call for the imposition of the death penalty," *see* N.C. Gen. Stat. § 15A-2000(c)(2) (2003) (emphasis added), or whether the aggravating factors "outweigh[ed] any mitigating circumstance *in a sufficiently substantial manner* so as to call for the death penalty," *see State* v. *Prevatte*, 570 S.E.2d 440, 486 (N.C. 2002) (emphasis added), without assessing the evidence supporting the particular aggravating factors submitted.

Understanding that which the plurality does not, the judge who presided over Allen's sentencing instructed the jurors that they were to decide "from *all the evidence* what value to give to each circumstance

and then weigh the aggravating circumstances so valued, against the mitigating circumstances, so valued." J.A. 95 (emphasis added). Just as it would be impossible to assess how much mitigating weight should be accorded a factor such as Allen's "rearing in a single-parent home" without considering evidence of the role Allen's father played in Allen's life even after Allen's parents divorced, so also would it be impossible to assess how much aggravating weight should be accorded the factors "that the murder was of a law enforcement officer while engaged in the performance of his official duties" and "that the murder was committed for the purpose of avoiding a lawful arrest" without any consideration at all of (i) the reckless crime spree Allen and his friends had been enjoying before Trooper Worley pulled them over, which explains *why* Allen had a motive to kill in order to avoid the lawful arrest he feared, (ii) that Trooper Worley had pulled the van driven by Allen's friend Worrell over to the side of the road and had just escorted Worrell into his patrol car when Allen approached, which explains *why* it can be said that Trooper Worley was doing no more no less than performing his "official duties" when he reached, unsuspecting, to let Allen into his car, and (iii) that Allen thus took advantage of Trooper Worley's defenseless position to shoot him three times, once through the head, and then left him literally to drown in his own blood, which explains *what* "the murder . . . of a law enforcement officer" would have meant to any reasonable juror who had already voted to find Allen guilty as charged of murdering Trooper Worley. Only with these details firmly in mind, details of which the plurality holds are irrelevant as a matter of law, could a juror possibly have begun to engage in any reasoned assessment of the strength of the aggravating factors that the state had submitted.

But, of course, it is *not* true that "there is no legal basis to weigh the overall circumstances of the crime outside the[ ] two [aggravating] factors." *See* Slip Op. at 42.[4] In fact, as North Carolina statute makes

---

[4]There is one respect in which the plurality opinion can actually be considered an improvement of the panel opinion with respect to the aggravating circumstances. While Judge Gregory's plurality opinion now at least recites the literal language of the aggravating factors that were submitted to the jurors, Judge Gregory's panel opinion originally issued a writ of habeas corpus requiring Allen's resentencing *without even recit-*

perfectly clear, "[i]n the [sentencing] proceeding there shall not be any requirement to resubmit evidence presented during the guilt determination phase of the case, unless a new jury is impaneled, but all such evidence is competent for the jury's consideration in passing on punishment." N.C. Gen. Stat. § 15A-2000(a)(3) (2003). And all of the evidence that the jurors heard in the guilt determination phase of the case, including the medical examiner's testimony that, as a result of the wounds which Allen inflicted, "Worley's lungs were hyperinflated due to blood rushing into the airways, essentially drowning him in his own blood," *State* v. *Allen*, 372 S.E.2d 855, 858 (N.C. 1988), and the testimony that Worley actually had a wife and two children whom Allen had deprived of a husband and father, was relevant to the assessment the jurors were *required* to make of the strength or weakness of any particular *mitigating* factor which they found to exist. It is for this reason, of course, that the trial court instructed the jury that it "must decide *from all the evidence* what value to give to each circumstance." J.A. 95 (emphasis added); *see also State* v. *Goodman*, 257 S.E.2d 569, 590 (N.C. 1979) ("The jury is charged with the heavy responsibility of subjectively, within the parameters set out by the statute, assessing the appropriateness of imposing the death penalty *upon a particular defendant for a particular crime*.") (emphasis added).

Ultimately, the inquiry under *Brecht* requires that we assess the effect that the error had on the reasonable juror during the sentencing proceedings *in this case*. Such a juror would *not* have either forgotten or ignored the details of the heinous crime Allen committed, for the conviction of which that very juror had himself just voted during the guilt phase of Allen's trial. And as the foregoing paragraphs demonstrate, neither would such a juror have in any way been legally foreclosed from considering the details of this crime when assessing the weight to give each of the submitted aggravating and mitigating factors in order to determine whether Allen should live or die *for the*

---

*ing the literal language of the aggravating factors that were submitted to the jury and unanimously found. See Allen* v. *Lee*, 319 F.3d 645, 656-58 (4th Cir. 2003). But, of course, as noted previously, the panel opinion did not even appreciate that the writ could not issue except upon a finding that the instructional error was harmless under *Brecht*.

*particular crime he had committed.* To the contrary, the jury was charged by the judge to make precisely such an assessment "*from all the evidence.*" J.A. 95 (emphasis added). The jury having been so charged, it is no more justifiable now for the plurality to ignore the details of Allen's crime while deliberating over whether Allen's sentence should be vacated, than it would have been for a juror to ignore the details of Allen's crime, while deliberating over the sentence Allen deserved.

C.

While, alone, the plurality's refusal to consider the particulars of Allen's crime in the course of reversing Allen's sentence is fatal to its finding of non-harmlessness under *Brecht*, the individual weakness of each of the foreclosed mitigating factors underscores even further the magnitude of the plurality's error in this case.

As, the plurality itself reluctantly is forced to acknowledge, neither the first nor second foreclosed mitigating factors, that Allen "ha[d] no significant history of prior criminal activity" and that Allen was thirty years old at the time that he murdered Worley, could reasonably have been considered sufficiently mitigating by a juror as to warrant life imprisonment rather than death, in light of the aggravated nature of Allen's murder of Worley. J.A. 100.

As to the first of these mitigating factors, Allen's criminal history record is not one that would prompt thought of mitigation. The record discloses that Allen had multiple prior convictions, for shoplifting, breaking and entering, and two counts of second degree burglary, R. 3362.

Neither would the second mitigating factor, Allen's age, lead any juror to vote for a life sentence for Allen. Indeed, at the time of the murder, Allen was neither juvenile, nor elderly; rather, born to Petersburg, Virginia parents in 1955, Allen was, as noted, *thirty years old* at the time that he murdered Trooper Worley. It would, of course, be entirely irrational for a juror to consider this fact one in mitigation of the brutal murder of a state trooper while he was engaged in the discharge of his official duties.

The third foreclosed factor was that "Timothy Lanier Allen was reared in a single-parent home." J.A. 100. No more than the first two, would this mitigating factor ultimately be considered mitigating by a reasonable juror. Again, the plurality only recites that evidence from the record that would arguably support its finding that "substantial evidence" exists in the record on the basis of which a juror could find several of the mitigating factors; it ignores all of the contrary record evidence.

As to this mitigating factor, the plurality relates that Allen "only" saw his father three or four times a year after his parents divorced and until Allen entered sixth grade. Slip Op. at 44. The plurality omits to mention, however, that, although Allen's parents had divorced when Allen was three, Allen's father remained financially supportive and in close contact with his children after the divorce. R. 3130-31. In fact, Allen's mother testified, and the jurors in the sentencing proceeding heard, that after Allen's mother moved with her children from Petersburg, Virginia, to Washington, D.C. (where Allen's father had relocated after the divorce) shortly before the start of Allen's sixth-grade year, Allen's father "was over to the house each and every other day to see the children and to see that they was minding, that they were in school, and were they getting their lessons, and if anything went wrong, he always chastised them." R. 3131. And, when Allen came of age to work, his father gave Allen and his first wife a job at the grocery store that Allen's father had established and owned. R. 3075. Thus, although the plurality would like to leave one with the impression that Allen did not have a strong male role model, such is anything but the case.

Additionally, Allen's mother testified that Allen had received a church education and had "plenty" while growing up. R. 3143-44. And as for the difficulties of "single-parent rearing," Allen's mother further stated that she did not raise her children alone; the children's grandmother lived with them at all times, and looked after them when Allen's mother was at work. R. 3127, 3129. The plurality mentions none of this obviously relevant evidence, even as it claims that "any one" of the five factors it deems "colorable" — necessarily including Allen's "single-parent rearing" — could have led a juror to vote for a life sentence.

In light of all of this evidence, and Allen's admission that he had suffered no physical abuse or neglect from his parents while growing up, R. 3087, it is unsurprising that the jury did not unanimously vote to consider Allen's rearing in a single-parent home to be a mitigating factor. It would have been affirmatively surprising for *any* juror to find that Allen's rearing should be accorded any mitigating weight at all in light of the specific crime that Allen had committed.

The fourth and sixth foreclosed mitigating factors were that "Timothy Lanier Allen is the father of three sons" and that "Timothy Lanier Allen was a supporting parent of at least one of his children." J.A. 100. While it is true as a factual matter that Allen fathered three sons, Allen lived with exactly none of his offspring. And in the very mitigating factor submitted to the jury, he only claimed before the court to be a supporting parent of one of them. The juxtaposition of these two mitigating factors — that Allen had three sons, but supported only one of them — would more likely have evoked distaste than sympathy.

And even accepting for the sake of argument that the evidence of Allen's close relationship with his eldest son is the most relevant mitigating evidence the jury was precluded from considering, the possibility that a juror would have spared Allen's life on the strength of this relationship is at best remote, in light of the fact that Allen himself took the life of not only a husband, but a father of two children, when he left Trooper Worley mortally wounded, all in a vain attempt to escape responsibility for the senseless crime spree on which Allen had embarked. R. 1259.

The fifth foreclosed mitigating factor was that "Timothy Lanier Allen remained employed during the times he was not incarcerated." J.A. 100. Obviously this provides an exceedingly uncomfortable basis for mitigation. The very statement of this factor is an unsettling reminder to the jury that there were other periods in Allen's life during which he was doing time in prison for other crimes, precisely the kind of evidence that would, if anything, reinforce the jury's considered sentencing conclusion. It is for *this* reason that "the dissent [did] not contest" whether or not Allen truly was able to "remain[ ] employed when he was not incarcerated" *see* Slip Op. at 44, not for any reason from which the plurality should draw encouragement.

The seventh factor not considered by the jury was the catch-all, "[a]ny other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value." J.A. 101. As with every other of the mitigating factors, the majority refrains from stating that any juror would have been likely to rely on this factor in voting for a life sentence. But it recites the following as evidence that might have been considered under this catch-all:

> Allen presented substantial evidence that his parents engaged in physical fights in his presence, which petrified him. In fact, their ultimate separation and divorce resulted from one such fight that occurred during Allen's third birthday party in which the police were called. Similarly, the jury heard evidence that Allen was a shy, timid person, bullied by others, who did not use firearms, and was unwilling or unable to fight back. And although Allen was never physically abused as a child, from an early age he lost himself in alcohol and drugs.

Slip Op. at 44.

None of this evidence would have remotely influenced a reasonable juror to spare Allen's life. It denigrates the seriousness of Allen's offense for the majority even to intimate that, for example, a juror would have found that a fight that occurred between Allen's parents at Allen's *third* birthday party, twenty-seven years before he murdered Trooper Worley, or that Allen was "shy" would be relevant to Allen's culpability in taking the life of Raymond Worley, much less sufficiently dispositive to warrant a life sentence.[5] Obviously, Allen's

---

[5]Suffice it to say, the plurality also dramatically overstates the value of the testimony that Allen was a "shy, timid person . . . , [who] was unwilling or unable to fight back." Slip Op. at 44. This testimony was not uncontroverted. The state expressly rejected the characterization of Allen as a "shy, timid person" at sentencing, and with good reason. *See* R. 3284-85. The very circumstances of Allen's murder of Trooper Worley — and the crime spree that precipitated it — serve to refute a description of the defendant as "shy and timid," as do his numerous, prior criminal convictions for breaking and entering and for burglary. And this very example shows yet another way in which evidence of the circumstances of Allen's crime, which the plurality refuses even to acknowledge, is *essential* to any candid assessment of the weight of the mitigating evidence submitted.

does not even begin to approach the type of "nightmarish" childhood that might have led a juror to believe Allen had no option but to lead a life of violence and self-destruction that ultimately culminated in the murder of which Allen was convicted. *Williams* v. *Taylor*, 529 U.S. 362, 395 (2000). It bears repeating that Allen testified that he had suffered no physical abuse or neglect at his parents' hands, and that his parents got along most of the time when they were together. *Compare Wiggins* v. *Smith*, 123 S. Ct. 2527, 2542 (2003) ("Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case."); *Williams*, 529 U.S. at 395 (revealing that "Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings," and that "Williams had been severely and repeatedly beaten by his father").

In fact, although I am sure she hoped, as would any mother, that the jurors would spare her son's life, I doubt even Allen's own mother would have agreed with the plurality's claim that Allen's childhood ought be considered mitigating with respect to the terrible crime Allen had committed. Such, indeed, is the only inference one can reasonably draw from the following colloquy which occurred between one of the prosecutors and Allen's mother at the sentencing proceedings, and which the jurors charged with sentencing Allen heard:

> Q.  Did you have occasion to talk with [Allen] about this stealing people's things —
>
> A.  Yes.
>
> Q.  Anytime?
>
> A.  Yes.
>
> Q.  What did you tell him about stealing people's things?
>
> A.  What doesn't belong to him, he was taught never to put his hand on nothing that did not belong to him.

Q.   How about—

A.   *Because he had no reason to do any of that if he done these things he had no reason to do it. We had plenty and he had no reason to have to go to any of that.*

R. 3142-43 (emphasis added).

### D.

Aware of the weakness of each mitigating factor individually, the plurality attempts to buttress its reasoning by emphasizing "the possible *cumulative* impact of the additional mitigating factors." Slip Op. at 46 (emphasis added). Thus, the plurality hedges its reliance on the bold statement that "any one" of the five foreclosed factors might have supported a vote for a life sentence with the fall-back position that "even if a juror might not have found that each of those additional factors independently outweighed the aggravators, a reasonable juror well could have concluded to the contrary when considering those factors *collectively, and in addition* to the three unanimously found mitigators." *Id.*

This is nothing more than unabashed speculation of the kind that the Supreme Court has admonished cannot justify putting the state to the arduous task of resentencing at any time, let alone eighteen years after a jury has rendered its verdict. *See Calderon*, 525 U.S. at 146. Having never even attempted to assess the weight of the aggravating factors, and having never candidly assessed the strength of the individual mitigating factors, the plurality actually has no idea what cumulative impact the foreclosed mitigators would have had, if not for the impermissible unanimity instruction. But the nature of Allen's crime, and the strength of the aggravators that the state submitted and the jurors did unanimously find, make it highly improbable that a juror would have been persuaded to spare Allen's life even by the cumulative impact of all the foreclosed mitigators.

### E.

In sum, on this record, actually balancing the aggravating and mitigating factors against the backdrop of the record facts of Allen's cold-

blooded murder of Trooper Worley, *which the plurality never even attempts to do*, no judge could claim that the instructional error in this case had a "substantial and injurious effect" on the jury that sentenced Allen to death.

### III.

With good reason unwilling to join in the plurality's untenable finding of a "substantial and injurious effect," Judge Traxler rests decision on the narrower ground of "grave doubt," concluding that the evidence is "in 'virtual equipoise as to the harmlessness of the [*McKoy*] error.'" Slip Op. at 26-27. While even Judge Traxler's conclusion is ultimately unpersuasive in light of the palpable weakness of both the mitigating factors themselves and the evidentiary support for these factors, and the contrasting strength of the aggravating circumstances, one can hardly help but be struck by the many ways in which Judge Traxler's opinion confirms the indefensibility of the plurality's opinion, and thus the precariousness of the majority's judgment. Among other things, clearly understanding the plurality's error in refusing even to describe the circumstances of Allen's crime, Judge Traxler describes those circumstances in detail, up to and including the medical examiner's statement that because of the mortal wounds Allen had inflicted, "Worley's lungs were hyperinflated due to blood rushing into the airways, essentially drowning him in his own blood." *Compare* Slip Op. at 34-49 (plurality opinion) (never once describing the circumstances of Allen's crime) *with* Slip Op. at 20-22 (Traxler, J., concurring in the judgment) (setting forth a detailed description of the evidence of Allen's crime which the jurors heard during the guilt phase of the trial). Second, Judge Traxler notes and incorporates into his analysis the fact that Allen was raised by his mother and his grandmother, who lived with the family at all times, a fact that the plurality entirely omits in holding that Allen's "single-parent rearing" could be relied upon to sentence Allen to life rather than death. *Compare* Slip Op. at 43-44 (plurality opinion) (explaining that "Allen offered evidence that from the time he was a young boy he was raised in a single-parent home," but nowhere acknowledging that Allen's grandmother helped raise him) *with* Slip Op. at 27 (Traxler, J., concurring in the judgment) (acknowledging that Allen was reared "by his mother and grandmother"). Third, Judge Traxler acknowledges and incorporates into his analysis Allen's own mother's testimony at

sentencing that Allen had "plenty," testimony that the plurality refuses even so much as to cite. *Compare* Slip Op. at 43-45 (plurality opinion) (stating that Allen had "exhibited some redeeming qualities — including efforts to overcome a less than ideal childhood," while omitting to recite the testimony of Allen's mother that Allen "had plenty and he had no reason to have to go to any of that") *with* Slip Op. at 27 (admitting that "Allen's mother testified that Allen received a church education and had 'plenty'"). And finally, flatly rejecting the plurality's holding that "any one" of five mitigating factors might have influenced a juror to spare Allen's life, Judge Traxler concludes only that the evidence as to the harmlessness of the error is in "equipoise." *Compare* Slip Op. at 45-46 (plurality opinion) ("Any one of the[ ] fifty-five possible [but foreclosed] votes could, in turn, have formed the basis for a decision against the imposition of the death penalty.") *with* Slip Op. at 26-27 (Traxler, J., concurring) ("[A]lthough I cannot say with certainty that the unanimity instruction had a substantial and injurious effect or influence on the verdict of death, the nature of the error in this case unquestionably leaves me in grave doubt as to whether it was in fact harmless.").

In effect, the juxtaposition of Judge Traxler's analysis with the plurality's conclusory findings all but confirms to any reader the untenability of the conclusion that the *McKoy* error in this case was harmful.

Indeed, himself uncertain even about his tentative conclusion that the mitigating evidence is enough to produce "grave doubt" about the harmlessness of the error, Judge Traxler adds an alternative rationale for his finding of "grave doubt," a prediction that had the North Carolina Supreme Court itself recognized the error in its reliance on the jury poll, it likely would not have engaged in any reweighing of the evidence proffered during the sentencing phase. Rather, Judge Traxler concludes, that court would have presumed that because the existence of at least some of the mitigating factors submitted by Allen were supported by evidence, the *McKoy* error was not harmless. From this prediction, Judge Traxler contends, "[i]t seems perverse that we . . . consider denying habeas relief from a North Carolina death sentence imposed under North Carolina's death sentencing scheme because we believe, based upon *our* 'reweighing' of the evidence under *Brecht*, that it should be upheld in the face of knowing that the North Carolina Supreme Court *did not* find the *McKoy* error harmless for that reason

under the *Chapman* [v. *California*, 386 U.S. 18 (1967),] standard and *would not* have performed such a reweighing itself." Slip Op. at 29 (Traxler, J., concurring in the judgment) (emphases in original).

Though Judge Traxler purports to be aware of the difference between the North Carolina Supreme Court's application of *Chapman* (to decide on *direct review* whether a constitutional error was harmless) and our application of *Brecht* (to decide on *collateral review* whether a constitutional error was harmless *and therefore warrants the issuance of a writ of habeas corpus*), *see* Slip Op. at 30, he fails to recognize that this difference is fatal to his argument.

What Judge Traxler alludes to, but nowhere explicitly states, is that the *Chapman* standard, which is the standard applied by the North Carolina Supreme Court in all of the cases to which Judge Traxler cites, is a much higher standard for harmlessness than *Brecht*. While *Chapman* requires proof "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," 386 U.S. at 24, for the error to be declared harmless, *Brecht* only requires the court to assure itself that the error did not have "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623. The difference between these harmlessness standards is no mere accident. In fact, the Supreme Court in *Brecht* explicitly adopted a less stringent standard for harmlessness (and, thus, a corresponding more stringent standard for harm*ful*ness) in the context of collateral review, explaining that "application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence." *Id.* Thus, application of a less onerous harmlessness standard on collateral review, and not the application (which Judge Traxler in this case alternatively advocates) of the same harmlessness methodology the state court would likely have applied, *is* the mechanism through which the Supreme Court has instructed federal courts to show "comity and respect for the state courts." Slip Op. at 46 (Traxler, J., concurring in the judgment).

The reason why the difference between *Brecht* and *Chapman* is fatal to Judge Traxler's claim is this: Because of that difference, as the Court emphasized in *Brecht*, "'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a

final judgment.'" *Id.* at 619 (quoting *United States* v. *Frady*, 456 U.S. 152, 165 (1982)).

In this case, thus, it can be assumed *arguendo* that the North Carolina Supreme Court would have ordered resentencing had *it* both recognized that the jury poll does not reveal anything about how the individual jurors would have voted and then reached a conclusion that the *McKoy* error was harmful under *Chapman* after eschewing any reweighing of the evidence. But *we*, while conducting collateral review, are still constrained to deny relief, because the error by any reasonable standard *must* be considered harmless under *Brecht*.

Ultimately, therefore, what Judge Traxler views as "perverse" is nothing more than a logical consequence of the fact that the *Brecht* standard allows more errors to be declared harmless than does the more stringent standard under *Chapman* v. *California*.

### IV.

Under *Brecht* v. *Abrahamson*, a federal court setting aside a sentence of death owes the state court system and the jurors that reached that determination a detailed explanation of the reasons why a reasonable juror would have been swayed by the evidence she was precluded from considering, no less than the court owes the same to a defendant when it concludes that a constitutional error is harmless and denies to him the opportunity to be re-sentenced by a jury, *see Clemons*, 494 U.S. at 753-54.

Instead of the detailed, reasoned explanation required under *Brecht*, the plurality has offered only conclusory statements bereft of any analysis or even discussion, in justification of the court's order releasing Allen from the death sentence imposed for his cold blooded murder of Trooper Worley. In place of the reasoned weighing of mitigating factors and aggravating circumstances that is required by *Brecht*, and that until today has been required by this Circuit, it has attempted to substitute a glib standard premised impermissibly on the fact of occasional random or irrational juror conduct. And in place of studied attention to the individualized circumstances of a petitioner's life and the particular circumstances of his crime, it has substituted attention to such frivolous details as that a fight might have occurred

between parents at a birthday party as many as twenty-seven years before the crime in question was even committed.

An opinion that flouts more conspicuously the Supreme Court's decision in *Brecht* v. *Abrahamson* one would be hard-pressed to imagine.

For these reasons, I dissent.